1  Lincoln Combs  (No. 025080)
2  GALLAGHER & KENNEDY, P.A.
   2575 E. Camelback Road, Suite 1100
3  Phoenix, Arizona 85016-9225
   Telephone:   (602) 530-8054
4  Facsimile:    (602) 530-8500
   E-Mail:        lincoln.combs@gknet.com
5
6  *Attorney for Plaintiff*

7                    **UNITED STATES DISTRICT COURT**
                        **DISTRICT OF ARIZONA**
8

9  COLETTE CARPENTER, individually and        No. _____
   as Administrator of the Estate of CLAYTON
10 O. CARPENTER, deceased; JON
   TERNSTROM, an individual; MARIA
11 TERNSTROM, an individual; CAMERON          **COMPLAINT**
   WITZLER, an individual; and MICHELLE
12 WITZLER, an individual,

13              Plaintiffs,

14       vs.

15 BAE SYSTEMS PROTECTION
   SYSTEMS, INC,
16

17              Defendant,

18 PAUL CARPENTER, an individual,

19              Nominal Defendants.

20

21

22         COMES  NOW  the  Plaintiffs  COLETTE  CARPENTER,  individually  and  as

23 Administrator  of  the  Estate  of  CLAYTON  O.  CARPENTER,  deceased,  JON

24 TERNSTROM,  MARIA  TERNSTROM,  CAMERON  WITZLER,  and  MICHELLE

25

26

GALLAGHER & KENNEDY, P.A.
2575 EAST CAMELBACK ROAD
PHOENIX, ARIZONA 85016-9225
(602) 530-8000

1

WITZLER (hereinafter the "Plaintiffs") and for causes of action against the Defendants identified herein, and each of them, alleges:

## PLAINTIFFS

1.     On January 15, 2014, Captain Clayton O. Carpenter (posthumously promoted to the rank of Major) (hereinafter "CARPENTER" and "Deceased") was on active duty in the U.S. Army and was the co-pilot of the subject MH-60M Blackhawk helicopter, Tail Number 05-20005 (hereinafter "Blackhawk"), an aircraft equipped with dual controls, at the time of the crash. CARPENTER died when the aircraft he was piloting experienced a mechanical failure, entered into an uncontrollable spin, lost altitude, and crashed.

2.     At the time of the crash, CARPENTER was Basic Mission Qualified, and was assigned to C Company, 3/160th Special Operations Aviation Regiment (A).

3.     Plaintiff COLETTE CARPENTER is the duly appointed and acting Administrator of the Estate of Clayton O. Carpenter, deceased, and she brings this action in her individual capacity as the surviving mother of CARPENTER, in her representative capacity for the Estate of Clayton Carpenter, and for the use and benefit of all persons entitled to recover for the death of CARPENTER, deceased. The Estate of Clayton Carpenter is organized and existing according to the law of the State of Georgia, and is being administered (Estate No. C-7059) in Chatham County Probate Court, Georgia.

4.     Plaintiff COLETTE CARPENTER is the duly appointed Special Administrator in the ancillary estate that was opened in the Los Angeles Superior Court,

2

Central District (Case No. BP155341). Letters of Special Administration were issued on September 4, 2014.

5.     Plaintiff JON TERNSTROM (hereinafter "TERNSTROM") was on active duty in the U.S. Army and was acting as pilot-in-command of the Blackhawk at the time of the crash. At all relevant times herein, TERNSTROM was and is domiciled in the State of California.

6.     At the time of the crash, TERNSTROM held the rank of Chief Warrant Officer 3 in the U.S. Army, was Fully Mission Qualified, and was assigned to C Company, 3/160th Special Operations Aviation Regiment (A).

7.     At all relevant times alleged herein, Plaintiff MARIA TERNSTROM was and is the wife of JON TERNSTROM.

8.     Plaintiff CAMERON WITZLER (hereinafter "WITZLER") was on active duty in the U.S. Army and was acting as the Crew Chief onboard the Blackhawk at the time of the crash.

9.     At the time of the crash, WITZLER held the rank of Specialist in the U.S. Army, was Basic Mission Trained CE, and was assigned to C Company 3/160th Special Operations Aviation Regiment (A).

10.     At all relevant times alleged herein, Plaintiff MICHELLE WITZLER was and is the wife of CAMERON WITZLER.

**NOMINAL DEFENDANT**

11.    PAUL CARPENTER, the father of CARPENTER, is identified as a Nominal Defendant herein because he may be an heir of CARPENTER, deceased.

## DEFENDANTS

12.    BAE Systems Protection Systems, Inc. (hereinafter "BAE DEFENDANT") was and is an Arizona corporation, registered and doing business in the City of Phoenix, County of Maricopa, and State of Arizona. After filing and litigating its Motion to Dismiss, BAE entities was dismissed from the case filed in the USDC for the Central District of California (Case No. 2:14-cv-07793-JAK) on the grounds of lack of personal jurisdiction.

13.    At all relevant times, BAE, among other things, designed, manufactured, tested, inspected, assembled, maintained, trained, distributed, advertised, instructed, marketed, warranted, and sold the pilot seats and related parts and systems that were installed on the Blackhawk.

## ENTITIES NAMED IN COMPANION CASES[1]

14.    At all relevant times herein, Defendant SIKORSKY AIRCRAFT CORPORATION was and is a Delaware corporation with its principle place of business in Stratford, Connecticut. At all relevant times herein, Defendant SIKORSKY SUPPORT

---

[1] The entities identified in this section have been (or will be) sued in other jurisdictions. Due to an inability to obtain jurisdiction over all defendants in a single jurisdiction, plaintiffs will file a petition for Multi-District Litigation and coordinate all related cases.

SERVICES, INC. (dba Sikorsky Aerospace Maintenance) was and is a Delaware corporation with its principle place of business in Stratford, Connecticut.

15.    At all times relevant herein, Defendants SIKORSKY, and SIKORSKY AEROSPACE, (hereinafter collectively referred to as "SIKORSKY") among other things, designed, manufactured, tested, inspected, assembled, instructed, maintained, trained, distributed, wrote manuals, advertised, marketed, warranted, and sold the UH-60 Blackhawk line of aircraft and its component parts and systems, including, but not limited to, the MH-60M model aircraft (05-20005) involved in this crash.

16.    After filing and litigating their Motion to Dismiss, SIKORSKY entities was dismissed from the case filed in the USDC for the Central District of California (Case No. 2:14-cv-07793-JAK) on the grounds of lack of personal jurisdiction. A lawsuit is being prepared against Sikorsky and it will be filed in the USDC for the District of Connecticut.

17.    At all times herein mentioned, SIKORSKY DEFENDANTS, and each of them, and their aggregates, associates, and partners, and each of them, were the agents, servants, employees, assignees, permissive users, successors in interest or joint venturers of each other, and were acting within the time, purpose, or scope of such agency or employment or permission; and all acts or omissions alleged herein of each such Defendant were authorized, adopted, approved, or ratified by each of the other Defendants.

18.    PROTOTYPE  ENGINEERING  AND  MANUFACTURING,  INC. (hereinafter "PROTOTYPE") was and is a California corporation, registered and doing business in the City of Gardena, County of Los Angeles, and State of California. PROTOTYPE is named as a defendant in a pending action in the USDC Central District of California, Case Number 2:14-cv-07793-JAK.

19.    At all times relevant herein, PROTOTYPE, among other things, designed, manufactured, tested, inspected, assembled, maintained, distributed, and warranted, among other things, the tail-rotor pitch change assembly, related systems, and component parts that were installed on the Blackhawk at the time of the subject crash, pursuant to a maintenance contract with the United States Government.

20.    CUBIC DEFENSE APPLICATIONS, INC. (hereinafter "CUBIC") was and is a California corporation, registered and doing business in the City of San Diego, County of San Diego, and State of California. CUBIC is named as a defendant in a pending action in the USDC Central District of California, Case Number 2:14-cv-07793-JAK.

21.    At all times relevant herein, CUBIC, among other things, designed, manufactured, tested, inspected, assembled, instructed, maintained, trained, distributed, advertised, marketed, and warranted, among other things, the Electronic Locator Transmitter (hereafter "ELT") and related components that were installed on the Blackhawk at the time of the subject crash.

6

22.     L-3 Communications Integrated Systems, L.P. (hereinafter "L-3") was and is a Delaware limited partnership with its principle place of business in Dallas, Texas. The case against L-3 was recently transferred from the USDC for the Central District of California (Case No. 2:14-cv-07793-JAK) to USDC for the Northern District of Texas, Dallas Division and assigned Case Number 3:15-cv-02438-B.

23.     At all relevant times, L-3, among other things, designed, manufactured, tested, inspected, wrote manuals, assembled, maintained, trained, distributed, advertised, instructed, marketed, warranted, and sold, among others, the MH-60M model aircraft generally, including the Blackhawk, specifically, and the selection and installation of its component parts and systems.

24.     Plaintiffs are informed and believe and thereon allege that L-3 participated in and were actively engaged in the development, design, manufacture, testing, assembly, selection, overhaul, and maintenance of the MH-60M model helicopter and its parts and systems, including the subject Blackhawk, and the parts and systems discussed specifically herein.

25.     At all times herein mentioned, the entities identified in Paragraphs 16-24 above, the b, and each of them, and their aggregates, associates, and partners, and each of them, were the agents, servants, employees, assignees, permissive users, successors in interest or joint venturers of each other, and were acting within the time, purpose, or scope of such agency or employment or permission; and all acts or omissions alleged

herein of each such Defendant were authorized, adopted, approved, or ratified by each of the other Defendants.

## JURISDICTION AND VENUE

26.  This Court has original subject matter jurisdiction of this matter pursuant to Article I, § 8, cl. 17 of the U.S. Constitution, as this incident occurred in a federal enclave, namely the Hunter Army Airfield in Savannah, Georgia.  *See Willis v. Craig*, 555 F.2d 724, 726 (9th Cir. 1977); *Celli v. Shoell*, 40 F.3d 324, 328 (10th Cir. 1994).

27.    Venue is based on 28 U.S.C. §1391(b)(2) because a substantial part of the events giving rise to this action occurred in this judicial district, and each Defendant is subject to personal jurisdiction in this Court.

28.    The crash occurred wholly within Hunter Army Airfield which is located in Savannah, Georgia. Hunter Army Airfield is operated, controlled, maintained, and secured by the Federal Government, through the Department of the Army.  Pursuant to 16 U.S.C. § 457 this case will be governed by the substantive laws of Georgia.

## THE CRASH

29.    On January 15, 2014, TERNSTROM was acting as Pilot-in-Command, sitting in the front left seat, and CARPENTER was acting as the co-pilot, sitting in the front right seat. Both pilots were able to control the Blackhawk at any time from their respective positions in the front two seats of the aircraft. WITZLER was the Crew Chief and was seated in a crew seat during relevant portions of the flight.

30.     On January 15, 2014, after an uneventful training flight to St. Augustine, Florida, CARPENTER was at the controls of the Blackhawk as it made an approach to Hunter Army Airfield in Savannah, Georgia (hereinafter "Hunter") after receiving clearance from Hunter Air Traffic Control to land on Runway 28. During its approach to land on Runway 28 the Blackhawk suddenly and without warning, experienced, *inter alia*, a failure of the tail rotor pitch change assembly and began to spin in a direction opposite to the direction of the main rotor blades. CARPENTER announced to the crew that there was a problem, and despite appropriate flight control inputs as prescribed in all relevant training manuals and training exercises, was unable to stop or slow the spin. TERNSTROM immediately took control of the aircraft from CARPENTER. TERNSTROM and CARPENTER appropriately executed all prescribed emergency procedures for loss of tail rotor control to reduce the rate of spin.   Nonetheless, the Blackhawk continued out of control and impacted the ground.

31.     The Blackhawk entered an unrecoverable spin due to, among other things, the failure of the tail rotor pitch change assembly and related parts and components because PROTOTYPE, among other things, failed to install a necessary cotter pin during maintenance that it performed on the relevant components. Failure to install the cotter pin allowed, among other things, a spanner nut to back off, disconnecting all input connections from the tail rotor servo to the tail rotor pitch change shaft. The tail rotor and its related parts operate as an anti-torque device which counteracts the forces created by the spinning of the main rotor system and provides the pilot with control over the yaw

movement of the aircraft, around its vertical axis, through manipulation of foot pedals in the cockpit.

32.    During the crash sequence, the pilot seats, which were designed, manufactured, and maintained by BAE DEFENDANT, failed to, among other things, attenuate and absorb the tremendous forces of the impact, as they were designed and manufactured to do. The failure of the seats to perform as they were designed to do caused an exacerbation of the injuries that were suffered by CARPENTER and TERNSTROM.

33.    Upon impact with the ground, the ELT, which was designed, manufactured, and maintained by CUBIC, failed to transmit an emergency signal to air traffic control and emergency personnel indicating that the Blackhawk had crashed. The failure to transmit a signal was due to a malfunction of the ELT and/or its related components and systems. Failure of the ELT to transmit caused a significant delay in the arrival of medical aid and assistance and exacerbation of the injuries that were suffered by CARPENTER, TERNSTROM, and WITZLER.

34.    After the crash, CARPENTER was located inside the wreckage of the Blackhawk, having suffered, among other things, massive internal injuries. On information and belief, CARPENTER survived for some appreciable period of time after the crash, but died later as a result of those injuries.

35.    After the crash, TERNSTROM was found outside of the aircraft having extricated himself from the wreckage of the Blackhawk and summoned aid using his

cellular telephone. TERNSTROM survived, but suffered severe, and lasting, physical and psychological injuries as a result of the crash, some of which will be permanent. TERNSTROM was transported to the hospital where he received extensive medical care and attention.

36.    After the crash, WITZLER was located inside the wreckage of the Blackhawk. WITZLER survived, but suffered severe, and lasting, physical and psychological injuries, some of which will be permanent. WITZLER was transported to the hospital where he received extensive medical care and attention.

## FIRST CAUSE OF ACTION

### *STRICT PRODUCT LIABILITY*

*(By All Plaintiffs Against BAE Defendant)*

37.    Plaintiffs incorporate by reference each and every prior and subsequent allegation as though fully set forth at this point.

38.    At all relevant times, BAE DEFENDANT, among other things, designed, manufactured, published manuals, assembled, inspected, tested, instructed, maintained, trained, warranted, distributed, and sold the pilots' seats and their related component parts and systems that were installed on the Blackhawk at the time of the accident. The pilots' seats failed to absorb and/or attenuate the forces of the crash impact and contributed to the injuries that arose from the crash of the Blackhawk.

39.    At all relevant times, SIKORSKY, among other things, designed, manufactured, published manuals, inspected, tested, instructed maintained, trained,

11

selected, warranted, distributed, assembled, installed components, and sold the MH-60 model helicopter, including the Blackhawk, and its component parts, to the Army, including but not limited to the Pilots Seats and related components and systems, the ELT and related components and systems, and the tail rotor pitch change assembly and related components and systems, each of which failed during the flight and contributed to the subsequent crash and injuries.

40.    At all relevant times, L-3, among other things, designed, manufactured, published manuals, inspected, tested, instructed, maintained, trained, selected, warranted, distributed, assembled, installed components, and sold the MH-60M model helicopter, including the Blackhawk, and its component parts, to the Army, including, but not limited to the Pilots Seats and related components and systems, the ELT and related components and systems, and the tail rotor pitch change assembly and related components and systems, each of which failed during the flight and contributed to the subsequent crash and injuries.

41.    At all relevant times, PROTOTYPE, among other things, overhauled, designed, manufactured, assembled, inspected, tested, maintained, warranted, installed, and distributed the defective tail-rotor pitch change assembly and its related component parts that were installed on the Blackhawk at the time of the accident. The tail rotor pitch change assembly was defective in that, among other things, it was missing a crucial cotter pin necessary to hold the tail rotor assembly together during flight.

42.    At all relevant times, CUBIC, among other things, designed, manufactured, published manuals, assembled, inspected, tested, instructed, maintained, trained, warranted, distributed, and sold the ELT and its related component parts that were installed on the Blackhawk at the time of the accident.

43.    At all relevant times, the Blackhawk and its component parts were in substantially the same condition, including but not limited to, the tail rotor pitch change assembly and related systems and parts, the ELT and related systems and parts, the pilots seats and their related systems and parts, as each were when each left Defendants', and each of their, possession, except for normal wear and tear.

44.    At all relevant times, the Blackhawk and its components were used as intended by Plaintiffs and Plaintiffs' decedent and in a way that was reasonably foreseeable to Defendants, and each of them. The helicopter and its component parts' design, manufacture, assembly, and maintenance were each a substantial factor in causing the Blackhawk to crash, causing the death of CARPENTER, and causing the injuries to Plaintiffs, and each of them, as herein alleged.

45.    At all relevant times, the Blackhawk was defective in that, among other things, the tail rotor pitch change shaft and related systems and parts contained manufacturing and/or design, and/or maintenance, and/or assembly defects that caused mechanical failures during normal flight, resulting in the loss of control of the aircraft, the subsequent crash, and the death and injuries as herein alleged. Specifically, and among other things, PROTOTYPE failed to install a necessary cotter pin during overhaul

and maintenance of this critical flight control component which caused the tail rotor system to fail and the Blackhawk to enter into an unrecoverable spin.

46. At all relevant times, the Blackhawk was defective in that, among other things, the Pilot Seats and related systems and parts contained manufacturing, design, maintenance, and assembly defects that caused mechanical failures during the crash of the Blackhawk. The failure of the Pilot Seats to absorb and/or attenuate the forces of the crash impact, as expected, resulted in the death and injuries as herein alleged.

47. At all relevant times, the Blackhawk was defective in that, among other things, the ELT and related systems and parts contained manufacturing, design, maintenance, installation and assembly defects, each of which caused the failure of the ELT to transmit a signal to air traffic controllers and other emergency personnel indicating that a crash had occurred. This failure caused a substantial delay in the arrival of rescue personnel which delayed delivery of medical care and treatment to Plaintiffs, causing or contributing to the death of CARPENTER and exacerbation of TERNSTROM and WITZLER's injuries.

48. At all relevant times, the Blackhawk was defective in that, among other things, its manuals and publications failed to proscribe, instruct, caution, or require appropriate maintenance and inspection steps and procedures that might have prevented the failure of one or more of the BLACKHAWKS' components, parts, or systems, including the tail rotor pitch change shaft and relates systems and parts, the pilot seats and related systems and parts, and the ELT and related systems and parts.

49.     As a direct and proximate result of the foregoing defects and conditions in the Blackhawk and its component parts, the risks associated with the design thereof outweigh its benefits, taking into account the potential harm to the helicopter occupants and the public, the likelihood that this harm would occur, the existence of several alternative designs at the time of the design and manufacture, and the cost of safer alternative designs.

50.     Additionally, as manufactured, designed, assembled, instructed, maintained, distributed and sold, the Blackhawk, its tail rotor pitch change shaft and related systems and parts, the pilot seats and relates systems and parts, and the ELT and related systems and parts, and other parts, were defective in that the helicopter suffered catastrophic mechanical failure and loss of control during normal flight operations, failure of the pilots seats to absorb and attenuate the forces of impact, and failure of its ELT to transmit a signal, each causing the aircraft not to perform as safely as an ordinary consumer would have expected it to on the occasion in question, and further causing unreasonable delay in rescue and treatment of the injured crew.

51.     The Blackhawk's failure to perform safely was a substantial factor in causing the death of CARPENTER and damages to each Plaintiff as described herein, and as such, Defendants, and each of them, are strictly liable.

52.     The design, manufacture, maintenance, and assembly of the Blackhawk were and are defective and dangerous because the aircraft is not capable of safe flight throughout the entire operating envelope, for which it was supplied, does not meet

generally accepted performance requirements, and does not meet required manufacturing and quality control standards.

53.    The design, manufacture, maintenance, and assembly of the Blackhawk were and are defective and dangerous because the aircraft is not crashworthy and, in the event of a malfunction and impact with terrain, the aircraft did not and does not provide for survivability of the pilots and other occupants of the Blackhawk.

54.    As a direct and proximate result of the conduct of the Defendants, and each of them, CARPENTER suffered severe physical injuries and lived for an appreciable amount of time before finally succumbing to his extensive injuries.

55.    As a direct and proximate result of the conduct of Defendants, and each of them, the Estate of Clayton O. Carpenter suffered damages and injuries equal to the value of his life, from the perspective of the Decedent, the loss of the value of Decedent's lifetime earnings, and the intangibles related to loss of relationships, altruistic activities, and the general impact Decedent had on his community. Furthermore, as a direct and proximate result of the conduct of Defendants, and each of them, the Estate of Clayton O. Carpenter suffered from Decedent's experience of pre-death terror, pain and suffering.

56.    As a direct and proximate result of the conduct of the Defendants, and each of them, TERNSTROM was hurt and injured in his health, strength, and activity, sustaining injury to his body and shock to TERNSTROM's nervous system and person, all of which said injuries have caused and continue to cause him great pain and suffering. TERNSTROM alleges that said injuries will result in permanent disability, all to

Plaintiff's general damages in an amount within the jurisdictional limits of the above-entitled Court.

57.    As a direct and proximate result of the conduct of Defendants, and each of them, TERNSTROM was prevented from attending his usual occupation and he therefore alleges that he will thereby be prevented from attending to said usual occupation for a period in the future. The exact amount and value of working time lost or to be lost is undetermined at this time and Plaintiff will ask for leave to amend this pleading to set forth the exact amount thereof when ascertained or will offer proof thereof at the time of trial.

58.    As a direct and proximate result of Defendants' actions, and each of them, Plaintiff MARIA TERNSTROM has sustained and incurred injuries and damages, and is certain in the future to sustain and incur further losses, injuries and damages in that she has been deprived of the full enjoyment of her marital state. Plaintiff MARIA TERNSTROM has suffered and continues to suffer loss of companionship, comfort, solace, moral support, emotional support, love, felicity, affection, society, loss of physical assistance in the operation and maintenance of the home, loss of consortium, and loss of sexual relations with her spouse.

59.    As a direct proximate result of the conduct of the Defendants, and each of them, WITZLER was hurt and injured in his health, strength, and activity, sustaining injury to his body and shock to his nervous system and person, all of which said injuries have caused and continue to cause him great pain and suffering. WITZLER alleges that

said injuries will result in permanent disability to him, all to his general damages in an amount within the jurisdictional limits of the above-entitled Court.

60.    As a direct and proximate result of the conduct of Defendants, and each of them, WITZLER was prevented from attending to his usual occupation and he therefore alleges that he will thereby be prevented from attending to said usual occupation for a period of time in the future. The exact amount and value of working time lost or to be lost is undetermined at this time and Plaintiff will ask for leave to amend this pleading to set forth the exact amount thereof when ascertained or will offer proof thereof at the time of trial.

61.    As a direct and proximate result of Defendants' actions, and each of them, Plaintiff MICHELLE WITZLER has sustained and incurred injuries and damages, and is certain in the future to sustain and incur further losses, injuries and damages in that she has been deprived of the full enjoyment of her marital state. Plaintiff MICHELLE WITZLER has suffered and continues to suffer loss of companionship, comfort, solace, moral support, emotional support, love, felicity, affection, society, loss of physical assistance in the operation and maintenance of the home, loss of consortium, and loss of sexual relations with her spouse.

## SECOND CAUSE OF ACTION

### *BREACH OF WARRANTIES*

**(By All Plaintiffs Against BAE Defendant)**

62.    Plaintiffs incorporate by reference each and every prior and subsequent allegation as though fully set forth at this point.

63.    There existed, at the time of this accident, warranties of fitness for a particular purpose and merchantability that were implied from the sale of the Blackhawk and its component parts to the United States by Defendants, and each of them, regardless of any writing to eliminate them.

64.    The warranty of fitness for a particular purpose was breached by Defendants, and each of them, for the reasons set forth in this Complaint, in that, *inter alia*, the Blackhawk and its components were defective and inadequate for the purpose intended, safe flight, seats and prompt notices of emergency.

65.    The warranty of merchantability was breached by Defendants, and each of them, in that the Blackhawk and its components were not of fair or average quality as compared to other helicopters made by competitors or of the same quality as others manufactured or maintained by Defendants, and each of them, resulting in the crash, injuries, and delay, as alleged herein.

66.    As a direct result of the breaches of warranty and the conduct of Defendants, and each of them, the plaintiffs suffered the severe and permanent injuries described herein.

### THIRD CAUSE OF ACTION

*NEGLIGENCE*

**(By All Plaintiffs Against BAE Defendants)**

67.     Plaintiffs incorporate by reference each and every prior and subsequent allegation as though fully set forth at this point.

68.     At all times herein Defendants, and each of them, owed a duty to exercise reasonable care to the purchaser and user of the Blackhawk and its component parts. Defendants, and each of them, so negligently, carelessly, and recklessly, among other things, designed, manufactured, assembled, maintained, inspected, tested, instructed, trained, warranted, published manuals, distributed and sold the Blackhawk and its component parts, including, but not limited to, the tail rotor pitch change shaft and related systems and parts, the pilots seats and related systems and parts, and the ELT and related systems and parts, and other parts.

69.     As a direct result of the negligence and the conduct of Defendants, and each of them, the plaintiffs suffered the severe and permanent injuries described herein.

## **DEMAND FOR JURY TRIAL**

Plaintiffs and each of them demand a jury trial on all issues and causes of action.

## **PRAYER**

WHEREFORE, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

A.     COLETTE CARPENTER, surviving mother, on behalf of the Estate of Clayton O. Carpenter:

1.     For past and future loss of earnings;

2.      For pre-death fright, terror, pain, and suffering according to the enlightened conscience of a fair and impartial jury;

3.      For damages constituting the full value of the life of Clayton O. Carpenter;

4.      For personal property damages according to the enlightened conscience of a fair and impartial jury;

5.      For costs of the decedent's funeral, burial, and related expenses according to proof;

6.      For pre-judgment and post-judgment interest as allowed by law;

7.      For costs of suit incurred herein; and

8.      For such other and further relief as this court may deem just and proper.

B.      JON TERNSTROM and MARIA TERNSTROM:

1.      For general damages according to the enlightened conscience of a fair and impartial jury;

2.      For special damages according to the enlightened conscience of a fair and impartial jury;

3.      For loss of consortium according to the enlightened conscience of a fair and impartial jury;

4.      For personal property damage according to the enlightened conscience of a fair and impartial jury;

5.      For pre-judgment and post-judgment interest as allowed by law;

6.      For costs of suit incurred herein; and

7.      For such other and further relief as this court may deem just and proper.

C.      CAMERON WITZLER and MICHELLE WITZLER:

1.      For general damages according to the enlightened conscience of a fair and impartial jury;

2.      For special damages according to the enlightened conscience of a fair and impartial jury;

3.      For loss of consortium according to the enlightened conscience of a fair and impartial jury;

4.      For personal property damage according to proof;

5.      For pre-judgment and post-judgment interest as allowed by law;

6.      For costs of suit incurred herein; and

7.      For such other and further relief as this court may deem just and proper.

DATED this 26th day of August, 2015.

GALLAGHER & KENNEDY, P.A.

By ___/s/ Lincoln Combs_____
          Lincoln Combs
          2575 E. Camelback Road, Suite 1100
          Phoenix, Arizona  85016-9225
          *Attorney for Plaintiff*

5015767v1/26814-0001

22